**STX, INC., Plaintiff,**

v.

**BRINE, INC., and Warrior Lacrosse, Inc., Defendants.**

**No. Civ. AMD 97–1578.**

United States District Court,
D. Maryland.

Feb. 25, 1999.

---

James K. Archibald, Venable, Baetjer & Howard, Baltimore, MD, Rudolf E. Hutz, Mary W. Bourke, Connolly, Boye, Lodge & Hutz, Wilmington, DE, for plaintiff.

D. Christopher Ohly, Patton & Boggs, Baltimore, MD, Brian M. Dingman, Westboro, MA, for Brine, Inc.

Mark A. Cantor, John S. Artz, Brooks & Kushman, P.C., Southfield, MI, for Warrior Lacrosse, Inc.

Shaun Michael Rose, Patton & Boggs, Baltimore, MD, for Sports Licensing, Inc.

## MEMORANDUM

DAVIS, District Judge.

This is an action for patent infringement involving three corporations that market equipment used in the sport of lacrosse, and in particular lacrosse sticks. Pending before the court are numerous motions, including cross motions for summary judgment on the merits of certain infringement claims and invalidity defenses. For the reasons explained below, I shall grant certain of the motions and enter a final judgment disposing of all claims.

## I. PROCEDURAL HISTORY

In January 1997, STX, Inc. ("STX") initiated this action against Brine, Inc. ("Brine") and Warrior Lacrosse, Inc. ("Warrior") in the United States District Court for the Eastern District of Virginia. That court transferred the action to this District in May 1997. STX alleged that Brine has been "infringing and inducing infringement" of its Patent No. 5,566,947 ("the '947 patent") by marketing lacrosse sticks under the trade names "Edge," "OZ," "M1," "MD," "MX," and "WMX." STX further alleged that Warrior committed like acts of infringement in respect to its lacrosse sticks having the trade names "Cobra," "Predator" and "Diablo." STX seeks a permanent injunction and damages.

Brine and Warrior separately answered the complaint, alleging in the aggregate virtually every known defense to an infringement action, including noninfringement, unenforceability, invalidity, laches and fraud on the patent office. In addition, in a counterclaim seeking equitable and monetary relief, Brine alleged that STX is infringing two of its patents, U.S. Patent No. 5,037,112 ("the '112 patent")

and U.S. Patent No. 5,035,434 ("the '434 patent") by virtue of its marketing of the "Excalibur," "Turbo" and "Raptor" lacrosse sticks. STX answered Brine's counterclaim asserting a host of defenses of its own. Warrior has not asserted an affirmative claim. All of the parties seek attorney's fees on the ground that this is an exceptional case under 35 U.S.C. § 285.

It came to light during discovery that Brine has only an exclusive license to market products that are designed under the '434 and '112 patents. The owner and licensor of both patents is Sports Licensing, Inc. ("SLI"). SLI and Brine have a relationship that is not uncommon in the patent licensing arena; they share a common ownership, William H. Brine, Jr., and Peter J. Brine and their families. The two companies have distinct roles. SLI was created for the sole purpose of acquiring and managing various types of intellectual property, including the two patents sued on by Brine in this action. Brine's role is to market products under SLI's patents as its exclusive licensee.

Thus, STX moved for summary judgment of dismissal as to Brine's affirmative claims on the ground of lack of standing after it became evident that Brine's licensing arrangement with SLI did not include a written grant of all substantial rights under the patents in suit. See Enzo APA & Son, Inc. v. Geapag A.G., 134 F.3d 1090, 1092–94 (Fed.Cir.1998) (A patent licensee has standing to bring an infringement action independently only if it has obtained a written grant of all substantial rights under the patent.).

Brine's standing dilemma was resolved when I granted SLI's motion to intervene. Cf. id. at 1093. When SLI intervened in the action, however, it elected to abandon any infringement claim based on the '112 patent. Thus, that patent is not properly before me and I shall dismiss without prejudice for lack of jurisdiction Brine's claims based on the '112 patent.

I held a hearing on the pending motions and the parties were given an opportunity to present argument on all issues, including issues related to claim construction. At my invitation, the parties supplemented their arguments with additional filings subsequent to the hearing. Having now considered the arguments of counsel, the motions and responses, and the summary judgment record compiled herein, I shall grant Warrior's motion for summary judgment on the ground that the '947 patent is invalid under 35 U.S.C. § 102(b) because the invention, properly understood as *not including* as a limitation in claim 1 the preamble thereto, was "on sale" more than one year before the inventors filed their patent application. In the alternative, I shall also conditionally grant Brine's motion for summary judgment on the ground that the only independent claim of the '947 patent, properly understood as *including* as a limitation in claim 1 the preamble thereto, is indefinite under 35 U.S.C. § 112, ¶ 2. I shall also grant STX's motion for summary judgment and declare that its Raptor product does not infringe Brine's '434 patent. The remaining motions shall be denied.

## II. STANDARDS FOR SUMMARY JUDGMENT

Summary judgment under Fed.R.Civ.P. 56 is appropriate in a patent case as in any other case. *Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 795–96 (Fed. Cir.1990). Fed.R.Civ.P. 56(c) provides that summary judgment is appropriate when "viewed in the light most favorable to the non-moving party, 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Cooke v. Manufactured Homes, Inc.*, 998 F.2d 1256, 1260 (4th Cir.1993); *see Matsushita Elec. Indust. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

A fact is material for purposes of summary judgment, if when applied to the substantive law, it affects the outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact. *Id.* at 248–49, 106 S.Ct. 2505. The opposing party's "response by affidavit or as otherwise provided in [Rule 56] must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The Court must enter summary judgment against a party who, "after adequate time for discovery ... fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## III. PRELIMINARY MATTERS

### A. Background of the '947 Patent

STX and/or its predecessor began manufacturing lacrosse sticks in the 1960s. In the early 1970s, STX developed the first synthetic lacrosse stick. Such sticks have become the standard for the game. Prior to the introduction of synthetic sticks, lacrosse sticks were composed of a one-piece construction of a handle with a head made of wood. Today, lacrosse sticks are generally composed of a head frame, including a throat portion at which a handle is affixed to the head. Generally, the head frame has two sidewalls and a transverse wall. Within the confines of the head frame is netting that is supported by loops connected to the sidewalls of the head frame. The netting allows a player to catch, carry and propel the ball during play. Numerous patents have issued covering lacrosse sticks.

As even a causual observer who has ever watched a serious game can attest, a team's success in the game is a function

most of all of the relative speed, strength, agility, determination, intelligence and overall athleticism of the competing players. For players of equal or near equal ability, however, the equipment and apparatuses used in the game—including but not limited to sticks, gloves, helmets and other protective gear—can make a significant difference in the quality of play and in the outcome of contests played at a high degree of fluid teamwork and individual proficiency.

On September 20, 1985, the inventors named in the '947 patent filed their application. The '947 patent is entitled "Lacrosse Stick Having Open Sidewall Structure" and issued on October 22, 1996, after an arduous eleven year prosecution history. The application from which the '947 patent matured described the invention as

> a new lightweight lacrosse stick having a double-wall, synthetic head having an opening or openings in the sidewalls to provide lightness and easy handling while retaining the strength and durability of the prior art lacrosse sticks having closed, or substantially closed, or solid sidewalls.

Prosecution History, Vol. 1, p. 10.

The '947 patent sets forth nine claims. Claim 1 is the only independent claim of the '947 patent. Each of the remaining claims is dependent upon claim 1, that is, each of claims 2 through 9 include all of the limitations of claim 1 in addition to the limitations recited in each of the dependent claims. The claims of the '947 patent are:

> 1. A head for a lacrosse stick which provides improved handling and playing characteristics comprising a generally V-shaped frame constructed of a synthetic polymeric material defined by two sidewalls joined at a juncture and diverging therefrom, a transverse wall joining tile ends of said sidewalls opposite of said juncture, said frame being adapted to receive a web, and said sidewalls having openings therein, the area of said openings including string holes comprising in the range of from about 7% to 65% of the entire area of said sidewalls.

> 2. The head for a lacrosse stick of claim 1 wherein the area of said openings is in the range of 25% and 35% of the entire area of said sidewalls.

> 3. The head for a lacrosse stick of claim 1 wherein the area of said openings is in the range of 30% to 33% of the entire area of said sidewalls.

> 4. The head for a lacrosse stick of claim 3 wherein said openings are in a trestle-like configuration comprised of three to seven triangular openings.

> 5. The head of a lacrosse stick of claim 4 wherein said trestle-like configuration is comprised of seven triangular openings.

> 6. The head of a lacrosse stick of claim 5 wherein said trestle-like configuration extends outwardly from said sidewalls.

> 7. The head for a lacrosse stick of claim 1 wherein said openings are in a polygonal shape.

> 8. The head for a lacrosse stick of claim 7 wherein said polygonal shaped openings are triangular.

> 9. The head for a lacrosse stick of claim 8 wherein said head is formed by injection molding of a synthetic polymeric material.

As is discussed in detail below, STX asserts that the most critical limitation of claim 1 is the recitation in the preamble to claim 1 that the invention provides "improved handling and playing characteristics" over the prior art closed sidewall lacrosse heads. Warrior and Brine contend, however, that "improved handling and playing characteristics" is not a limitation of claim 1 or any claim and that, in the alternative, even if the preamble is a claim limitation, such claim is fatally indefinite.

The "improved handling and playing characteristics" language was not initially included in claim 1. Rather, the phrase appeared one time in the specification un-

der "Primary Objects and General Description of the Invention." The language was added as a preamble to claim 1 in 1996 at the suggestion of the Patent Examiner ("the Examiner"), who, as described herein, had initially (and repeatedly) rejected the application, and who rejected the application an additional time even after the applicants added the phrase to the preamble to the claim.

A full appreciation for the storied prosecution history of the '947 patent is important to a complete understanding of the issues presented and my resolution of those issues. The initial application specification language covered a lacrosse stick described as "light weight," that had "easier and superior" handling characteristics, and which retained "the required strength and durability" necessary to high performance sticks. Prosecution History, Vol. 1, p. 10. The Examiner rejected claim 1 under 35 U.S.C. § 102(b) as anticipated by the "Deutsch reference," *id.* at 29, and as obvious under 35 U.S.C. § 103 in light of the teaching of a combination of prior "strung racquet" art. It is clear that the Examiner viewed the key feature of the invention as providing a *light weight* frame. He stated: "[t]hough the Deutsch reference only discloses string holes in the sidewalls, the weight of the frame is inadvertently reduced." *Id.* Similarly, as to the obviousness issue, the Examiner focused on the feature of providing a light weight lacrosse stick as the key feature of the invention:

> The Frolow patent discloses a tennis racket having reduced weight, while maintaining its strength. Though the Frolow reference discloses the head member having the openings … to reduce the weight of a tennis rac[quet], it would have been obvious to one of ordinary skill in the art to utilize this concept in other game type sticks, especially since Brine provides the motivation for reducing the weight of a plastic lacrosse stick … Hillman teaches holes

> … for decreasing the weight of a tennis rac[quet].

*Id.* at 30.

In December 1986, STX responded to the Examiner's rejection, stating:

> The invention is in the discovery that a lacrosse stick head having substantial open areas in the sidewalls provides *good playability characteristics* and, furthermore, *has the necessary structural strength in spite of the openings.* This is in contrast to the earlier double-wall lacrosse sticks including of the type shown in the Deutsch and Brine patents where the sidewalls are free of openings except for a limited number of holes required for stringing the net or webbing onto the sidewalls. … There is no suggestion [arising from the prior tennis racquet art] that a lacrosse stick head having an open area in each sidewall of from 7% and 65% can be provided to have *the essential strength while having improved playing characteristics.*

*Id.* at 36, 38.(emphases added). Thus, although the above response makes passing reference to alleged "improved playing characteristics," nothing in that response explicated this assertion. Throughout the prosecution history until early 1996, the applicants' submissions focused on arguments aimed at dissuading the Examiner (and later the Board of Patent Appeals) from his fixed obviousness objection grounded in the light weight feature of the invention.

Thus, in his surreply, although the Examiner relented as to the issue of anticipation, he again rejected the arguments advanced in the inventors' response to his rejection related to obviousness, again focusing on the light weight feature of the invention. He stated:

> Concerning applicant's response to the examiner's rejection under 35 U.S.C. 103, though Frolow is directed to a tennis rac[quet], the reference is related in that it is in the strung rac[quet] art. Surely one of ordinary skill in the art would think to look at other types of

strung rac[quets] to solve a problem of weight with a lacrosse rac[quet]. Frolow clearly teaches such concept, by removing portions of the game rac[quet]. Brine provides the motivation for reducing the weight of a lacrosse stick.

*Id.* at 44.

The inventors appealed to the Board of Patent Appeals and Interferences. In the appeal, the applicants stressed the importance of the "good playability characteristics" of the invention coupled with its ability to retain the required "structural strength" in spite of having openings in the sidewalls. *Id.* at 51–52. *See also id.* at 59 ("There is no suggestion in [the tennis racquet art] that a lacrosse stick ... can be provided to have the essential strength while having improved playing characteristics."). The notion of "playability characteristics" again received scant attention; the phrase was used in a wholly conclusory fashion.

The Board affirmed the decision of the Examiner. It found that "the particular problems which the applicants are attempting to solve deals [sic] with the weight of the stick.... The examiner has shown that the problems and solutions found in the lacrosse art are analogous to the tennis rac[quet] art. [The Brine prior art] recognizes the problem and Frolow provides a solution to the problem sought to be solved by the appellants...." *Id.* at 69.

The applicants sought reconsideration and attempted to persuade the Board that the obviousness objection was not welltaken. Again, they stressed, but only in a conclusory way, the assertion that the invention under review, in contrast to the prior art, offered "improved playing characteristics." *Id.* at 90; *and see id.* at 92 ("Openings in the sidewall would suggest that the lacrosse stick would have lower and unacceptable strength characteristics. Certainly there is nothing which would suggest that the playing characteristics would be improved."). The Board was unpersuaded that the applicants had overcome the obviousness objection and denied the applicants' motion for reconsideration in November 1990. The applicants filed continuation applications regularly over the next five years. In the meantime, STX and Brine (and later, Warrior) observed open sidewall lacrosse heads grow steadily in popularity to command a significant majority of the market.

In April 1996, the patent prosecution took on a new life. Claim 1 was amended to include the preamble language quoted above: "which provides improved handling and playing characteristics." *Id.* at 176. The record discloses that the amendment was suggested by the Examiner after a "very, very brief" telephone interview with the applicants' new counsel. *See* Bourke Dep. at 67. Thus, the applicants supported their renewed response to the Examiner's latest rejection with a legal memorandum focusing upon the evidence of the "improved handling and playing characteristics" contained in an accompanying declaration and report prepared by Nicholas P. Jones, Ph.D., of the G.W. C. Whiting School of Engineering at The Johns Hopkins University, and a declaration of William Crawford, a former collegiate lacrosse All America, retired vice president of STX and an expert in lacrosse stick design.

The applicants asserted that the evidence of "improved handling and playing characteristics" consisted of the following, as determined in the laboratory testing conducted by Prof. Jones, and as elaborated upon and interpreted by Crawford:

- a "drag reduction" of 15% to 38% over solid sidewall counterparts when exposed to wind force, resulting in a player being able to maneuver the open sidewall stick more efficiently and effectively in the course of play, and consequently greater and more efficient ball control and the achievement of higher ball speed when the player propels the ball;

- lower resistance to twisting and torquing movement, affording increased ball

control, a critical performance criterion for every player;

- less propensity to move up and down as the heads are exposed to aerodynamic forces at various angles during play, resulting in greater "controllability or more stable 'feel' ";
- a decrease in rebound or bounce when the ball hits the open sidewall, meaning the ball is less likely to bounce out of the pocket, and thereby enhancing a player's ability to receive and control a thrown ball and to run aggressively without mishap; and
- greater flexibility coupled with equal or greater recovery from deflection than prior art solid sidewall heads, affording an apparatus which is less likely to respond to the player's manipulation of the stick in a fashion not desired by the player.

*Cf. id.* at 175–76. In short, the applicants' counsel argued on the basis of this secondary evidence of non-obviousness that, fundamentally, the invention consisted not merely of a light weight lacrosse stick head, but one having "unique and superior handling and playing characteristics and playing properties when compared to prior art solid sidewall heads ... [including] superior aerodynamic properties ..., improved flexibility, greater head speed, improved power and accuracy in passing and shooting, and improved ball control." *Id.* at 180.

The Examiner was not convinced that the applicants had overcome the obviousness objection and once again rejected the claims. He stated:

> After careful review of the arguments set forth by the applicants and the declaration of William C. Crawford, however, the examiner is not convinced by the evidence in the declaration set forth in the arguments. The evidence and argument raise new issues which are not in the specification nor claims. For instance, the lacrosse head has improved maneuverability, quicker, and more efficient shooting and passing and more

goals scored [sic]. Further, the aerodynamics, rebound and reflex properties test results are argued. None of these critical features were discussed in the specification or claims.

*Id.* at 262. Thus, the Examiner viewed the April 1996 submission as something other than a mere continuation application; it raised "new issues" that were not encompassed by the "specification or claims" pending before him. *Id.*

After another telephone consultation between representatives of the applicants (including counsel) and the Examiner, counsel submitted a "Communication" to the Examiner. The "Communication" cited case law (and transmitted selected pages from such case law) that, according to counsel, supported the applicants' contention that "advantages and superior properties of an invention [should be] considered even though not specifically set forth in the specification or claims, and certainly must be considered when such advantages are disclosed at least *generically* in the application." (emphasis added). In other words, the inventors' ten year old contention—never before claimed as a limitation but merely as an "object and advantage" of the invention—that "improved handling and playing characteristics" were embodied in the invention, now had attained the respectability of scientific support (through laboratory tests) and a real world nexus through the declaration of Crawford—one skilled in the art—as to what the scientific test results meant to the player on the field.

Alas, then, the Examiner was now convinced that the secondary evidence had overcome the obviousness objection. Concomitantly and necessarily, he concluded that the failure of the asserted claims or specification to embody the functional outcomes of the invention (other than through the "generic" formulation of "improved handling and playing characteristics") was not fatal to the application. He stated, specifically, that

the applicant has provided sufficient objective evidence of non-obviousness in the declarations of William C. Crowford [sic] and Nicholas P. Jones to overcome the rejection of record. The examiner further believes that the specification generally discloses the invention, though not specifically, [sic] the advantages and superior properties of the invention are clearly disclosed in said declarations. The examiner finds support for such general disclosure in the cases cited....

*Id.* at 283. The '947 patent issued on October 22, 1996.[1]

### B. Expert Evidence is Not Necessary to Identify Persons Skilled in the Art

■ Determining the level of skill of an ordinary artisan is important to both the invalidity and infringement analyses. In particular, a determination of whether a patent is invalid under 35 U.S.C. § 102(b) or indefinite under 35 U.S.C. § 112, ¶ 2 turns in part on whether a person skilled in the art is able to practice the invention. *See Personalized Media Communications, LLC v. Int'l Trade Comm'n,* 161 F.3d 696, 705 (Fed.Cir.1998) (indefiniteness analysis). Additionally, infringement analysis requires construing claims and interpreting claim terms in a patent. Although claim construction is a matter of law, it is essential to proper claim construction to identify the skilled artisan for purposes of interpreting claims and claim terms.

Ordinarily, the level of skill in the art is established through the testimony of experts familiar with the art and the patent at issue. *Schutt Mfg. Co. v. Riddell, Inc.,* 673 F.2d 202, 205 (7th Cir.1982). On the other hand, the Federal Circuit has also held that expert testimony on the level of skill is unnecessary because the prior art itself reflects the level of skill and the prior art is "easily understandable." *Chore–Time Equipment, Inc. v. Cumberland Corp.,* 713 F.2d 774, 779 (Fed.Cir. 1983). *And see id.* at n. 2 ("We hold only that an invention may be held to have been either obvious (or nonobvious) without a specific finding of a particular level of skill or the reception of expert testimony on the level of skill where, as here, the prior art itself reflects an appropriate level and a need for ... expert testimony has not been shown."); *Markman v. Lehman,* 987 F.Supp. 25, 36 (D.D.C.1997).

■ Factors that may be considered in determining the level of ordinary skill in the art include: (1) type of problems encountered in the art; (2) prior art solutions to the problems; (3) rapidity with which innovations are made; (4) sophistication of the technology; and (5) educational level of

---

1. The ghost of the excruciating prosecution history of the '947 patent revisited the Examiner during the pendency of this action when a reexamination was undertaken at the request of Brine. The challenge was based on restated issues of anticipation and obviousness under prior art not previously evaluated by the Examiner. Brine argued that the newly introduced prior art disclosed the construction of openings in lacrosse head sidewalls to reduce the weight of lacrosse sticks and to improve playability by improving drag resistance and aerodynamics. Prosecution History, Vol. 2, pp. 1–19. STX fully participated in the reexamination proceeding and vigorously defended the patent.

Upon consideration of this new information, the Examiner concluded that the prior art cited by Brine "raised substantial new question [sic] of patentability as to claims 1–9." *Id.* at 102. Despite this finding, the Examiner filed a "Notice of Intent to Issue Reexamination Certificate" confirming the patentability of claims 1–9. Subsequently, Brine's counsel communicated with the Examiner and presented *additional* prior art and legal argument. Following a review of this additional evidence, the Examiner confirmed claims 4–6 only.

Not to be outdone, STX's representative met with the Examiner to discuss this newly introduced prior art. The interview summary notes disclose that they had a "[g]eneral discussion on the claimed invention" and "handling & playing characteristics was shown [-] key points were directed to in the declaration of record." *Id.* at 565. Following this meeting, STX filed a written response, *inter alia*, questioning the reliability of the prior art references introduced by Brine.

Ultimately, the Examiner confirmed claims 1–9.

active workers in the field. *Custom Accessories, Inc. v. Jeffrey–Allan Indus., Inc.,* 807 F.2d 955, 962 (Fed.Cir.1986) (footnote omitted). "The important consideration lies in the need to adhere to the statute, i.e., to hold that an invention would or would not have been obvious, as a whole, when it was made, to a person of 'ordinary skill in the art'—not to the judge, or to a layman, or to those skilled in remote arts, or to geniuses in the art at hand." *Id.* (citing *Environmental Designs, Ltd. v. Union Oil Co.,* 713 F.2d 693, 697 (Fed.Cir. 1983), *cert. denied,* 464 U.S. 1043, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984)). "In a given case, every factor may not be present, and one or more factors may predominate." *In re GPAC, Inc.,* 57 F.3d 1573, 1579 (Fed.Cir.1995).

There is disagreement between the parties as to the appropriate level (and kind) of skill against which the necessary analyses in this case are to be measured. Brine asserts that inventors of lacrosse heads (including the inventors named in the patents at issue in this case) are skilled in the art. STX contends, to the contrary, that the person of ordinary skill in the art is one possessing the ability to *play* lacrosse competitively and *design lacrosse heads* for competitive play. STX takes this position in part because it wishes to disassociate itself from the testimony of two of the inventors of the '947 patent who have never played lacrosse. *See* STX's Mem. in Opp. (§ 112) at 10 (citing *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 991, n. 3 (Fed.Cir.1995) (in banc) (Mayer, J., concurring in the judgment) ("Of course, the inventor's testimony as to what he intended or how he understands the patent, as opposed to his testimony as an expert, may be relevant, but is entitled to little weight in the face of evidence to the contrary."), *aff'd on other grounds,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996)).[2]

▌ I am persuaded that, as a matter of law, an artisan of ordinary skill in the art of designing lacrosse heads ("strung racquet art") is a skilled designer who has *either played lacrosse or, in the alternative, although not having played the game, is knowledgeable about how accomplished players use a lacrosse stick, and what performance features such players expect from their lacrosse sticks in the course of playing the sport on the collegiate or professional level.* Thus, the ordinary skilled artisan has the talent for design and knowledge of the sport equal to that possessed by inventors Peter Brine, William Brine III, Fielding Lewis, Robert Tucker, and Jackie Davis, each of whom has testified on deposition in this case.

## IV. THE PREAMBLE IS NOT A CLAIM LIMITATION IN THE '947 PATENT

A potentially dispositive issue before me is whether the preamble of claim 1 to the '947 patent is a claim limitation. I am persuaded that the preamble is not a claim limitation.

▌ "A patent claim typically has three parts: 1) the preamble; 2) the transition; and 3) the body." *E.I. DuPont De Nemours v. Monsanto Co.,* 903 F.Supp. 680, 693 (D.Del.1995) (citing 2 Donald S. Chisum, *Patents* § 806[1][b] (1994)). "The preamble is an introductory phrase that may summarize the invention, its relation to the prior art, or its intended use or properties. It may also constitute a limitation on a claim.... The transition is a phrase containing a term such as 'comprising' that serves to connect the preamble to the body of the claim.... The third part of a patent claim, the body, is composed of the recitation of the elements and limitations that 'define the product or process to be encompassed within the patent monopoly.'" *Id.* (internal quotation marks omitted).

---

**2.** I am confident that STX's miscitation of the footnote in Judge Mayer's concurring opinion

in *Markman* as a quotation of "the Federal Circuit" was entirely inadvertent.

■ The Federal Circuit has made it reasonably clear that the mere fact that a patentee finds something useful in a claim preamble in the course of litigation does not alone justify treatment of a claim preamble as a limitation. Thus, while it is certainly true that "where the preamble language is 'necessary to give life, meaning and vitality to the claim' or it is deemed 'essential to point out the invention defined by the claim,' the Federal Circuit has found that the language effectively limits the scope of the claim," *Boehringer Ingelheim Animal Health, Inc. v. Schering–Plough Corp.*, 984 F.Supp. 239, 247 (D.N.J. 1997) (*quoting Bell Communications Research, Inc. v. Vitalink Communications Corp.*, 55 F.3d 615, 620–21 (Fed.Cir.1995)), it is equally true that " 'where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention, the preamble is not a claim limitation.' " *Id.* (*quoting Rowe v. Dror*, 112 F.3d 473, 478 (Fed.Cir.1997)); *see also Ryobi North America, Inc. v. Emerson Elec. Co.*, 22 F.Supp.2d 1025, 1033 (E.D.Mo.1998) ("If the claim itself, without reference to the preamble, recites a structurally complete invention and the preamble merely describes the intended use of the product, the preamble is not a part of the claim's limitations."). While the matter is never free of all doubt, I take it that the long and short of the matter is that "[w]here a patentee uses the claim preamble to recite *structural limitations* of his claimed invention, the PTO and courts give effect to that usage," *Dror*, 112 F.3d at 478 (emphasis added), but that when he does not recite *structural limitations* in the claim preamble, he is not entitled to have the court pretend as if he did so by treating the preamble as a claim limitation.

■ "The determination of whether preamble recitations are structural limitations or mere statements of purpose or use 'can be resolved only on review of the entirety of the patent to gain an understanding of what the inventors actually invented and intended to encompass by the claim.' " *Id.* (quoting *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed.Cir.1989)). "The inquiry involves examination of the entire patent record to determine what invention the patentee intended to define and protect." *Id.*

■ Inspection of the entire record in this case, as set forth above, reveals that the preamble is not a structural limitation. The body of claim 1 defines a *structurally* complete invention. The preamble of the claim—"improved handling and playing characteristics"—is a mere recitation of the use, function, purpose and outcome of the open sidewall lacrosse head invention. At best, as elaborated upon by Jones and Crawford in their declarations, the phrase is a shorthand encapsulation of the *advantages* of the invention. As the inventors well knew, and as their counsel (and now STX's counsel) specifically represented to the Examiner in successfully overcoming the-ten-year old obviousness objection, *advantages* of inventions do not belong in claims. *See Preemption Devices, Inc. v. Minnesota Mining & Mfg. Co.*, 732 F.2d 903, 907 (Fed.Cir.1984) ("As for putting advantages ... in claims, counsel should know that they do not properly belong in claims, *the sole function of which is to point out distinctly the process, machine, manufacture, or composition of matter which is patented ... not its advantages.*") (emphasis added). As the successor-in-interest to the inventors who made this precise representation to the Examiner, represented by the same counsel, STX is not properly heard to contradict this principle now. *But see In re Schreiber*, 128 F.3d 1473, 1481 (Fed.Cir.1997) ("In passing, I also observe that the majority errs in stating that advantages not recited in the claim can not impart patentability to a new device. The advantages of an invention are often relied on to support patentability; whether they are included in the claim depends on a variety of factors, and

is not the subject of a rigid rule.") (Newman, J., dissenting).

Just as the Jones/Crawford exegesis on the meaning of "improved handling and playing characteristics" was not required to appear in the claim (or specification) in 1996, so now its presence in the preamble to a *structurally complete claim* does not transmute the phrase into a *structural* claim limitation.

In asserting that the preamble constitutes a claim limitation, STX specifically relies on text from *Bell Communications*, 55 F.3d at 621:

> [W]hen the claim drafter chooses to use both the preamble and the body to define the subject matter of the claimed invention, the invention so defined, and not some other, is the one the patent protects.

This language, if taken out of context, plainly conflicts with the principle that "[i]f the claim itself, without reference to the preamble, recites a structurally complete invention and the preamble merely describes the intended use of the product, the preamble is not a part of the claim's limitations." In light of the prosecution history of the '947 patent I am persuaded that my resolution of this conflict is consonant with the teachings of the Federal Circuit.

Indeed, although STX *concedes* that the preamble is a *functional* limitation and not a *structural* limitation, *see, e.g.,* STX's Mem. in Opp. (§ 102(b)) at 3 ("The 'improved playing and handling' language of claim 1 is a critical *functional limitation* [of the '947 patent].") (emphasis added), it argues nonetheless that I must credit the preamble because it gives meaning to claim 1 and defines the open sidewall invention. This is simply a conclusory contention and nothing more. STX says the fact that the Examiner insisted on this language makes this clear. To the contrary, I decline to undertake the impossible task of divining what was in the Examiner's mind in suggesting language *which he subsequently found, initially, did not cure the obviousness problem which he himself had identified.*

On its face, the preamble states the purpose or intended use of the open sidewall invention. Moreover, especially telling on the issue of completeness of the body of claim 1 as defining the invention is STX's admission during discovery that "improved playing and handling characteristics" *are inherent in the open sidewall design.* *See generally Procter & Gamble Co. v. Paragon Trade Brands, Inc.,* 989 F.Supp. 547, 628 (D.Del.1997) (holding language "improved fit and comfort" in patent for disposable diapers not a claim limitation, *inter alia,* because the size limitation placed on the thickness of the diaper in the crotch region "necessarily ha[d] improved fit and comfort."); *cf. Int'l Harvester Co. v. Deere & Co.,* 478 F.Supp. 411, 416 (C.D.Ill.1979), *vacated on jurisdictional grounds,* 623 F.2d 1207 (7th Cir.1980) (no legitimate factual dispute precluding summary judgment is created by affidavits contradicting admissions of the patent owner and inventors). This extraordinary admission largely explains the inventors' failure to have included "improved playing and handling characteristics" as a claim limitation in the application. If they had done so, the Examiner's anticipation objection might not have been abandoned so readily, *see generally In re Schreiber,* 128 F.3d at 1477, and almost certainly, enablement difficulties under 35 U.S.C. § 112, ¶ 1 would have arisen. *See Personalized Media,* 161 F.3d at 706.

In sum, then, I conclude as a matter of law that the preamble to claim 1 of the '947 patent is not properly understood as a claim limitation.

## V. IF THE PREAMBLE IS A CLAIM LIMITATION, THEN CLAIM 1 OF THE '947 PATENT IS INVALID FOR INDEFINITENESS UNDER § 112, ¶ 2

If, contrary to the view expressed above, the preamble is a claim limitation,

then claim 1 of the '947 is fatally indefinite under 35 U.S.C. § 112, ¶ 2. The second paragraph of § 112 provides: "The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." "[W]hether a claim is indefinite under 35 U.S.C. § 112, ¶ 2 is ... a question of law." *Personalized Media*, 161 F.3d at 705.

▇▇▇▇▇ A claim is indefinite if one skilled in the art would not understand the scope of the claim when read *in light of the specification*. *North American Vaccine, Inc. v. American Cyanamid Co.*, 7 F.3d 1571, 1579 (Fed.Cir.1993) (emphasis added). A claim that fails to provide sufficient notice to one skilled in the art so that he can avoid infringement is invalid on the ground of indefiniteness under § 112, ¶ 2. *Alco Standard Corp. v. TVA*, 597 F.Supp. 133, 157 (W.D.Tenn.1984), *aff'd*, 808 F.2d 1490 (Fed.Cir.1986), *cert. dismissed*, 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987). In conducting an indefiniteness analysis, I am limited to consideration of the specification; the prosecution history is not available for review in connection with an indefiniteness analysis under § 112, ¶ 2. *Cf. Personalized Media*, 161 F.3d at 705 (citing *Miles Laboratories, Inc. v. Shandon, Inc.*, 997 F.2d 870, 875 (Fed.Cir.1993)); *North American Vaccine*, 7 F.3d at 1579.

I draw this latter principle from the repeated admonitions of the Federal Circuit that indefiniteness analysis operates as a check on the scope of claims through the use of the specification, as they might be compared and contrasted by one reasonably skilled in the art. I am fully aware, of course, that claim construction necessarily takes the court beyond the four corners of the claim and specification. Nevertheless, I do not apprehend, as STX would have it, that indefiniteness analysis is simply a surrogate for claim construction, with its largely uncabined universe of source material. If an otherwise indefinite claim may be rehabilitated through the expedient of larding on through declarations in the prosecution history, then the process essentially amends § 112, ¶ 2 out of the Patent Act. *Cf. Intervet America, Inc. v. Kee–Vet Labs., Inc.*, 887 F.2d 1050, 1053 (Fed.Cir.1989) (distinguishing claim *validity* from claim *construction*). I agree with Brine that it would be error to collapse claim construction (for purposes of anticipation, obviousness or infringement analysis) into a statutory indefiniteness analysis and I decline STX's invitation to do so.

One district court recently succinctly stated the principles underlying the indefiniteness analysis as follows:

If the limits of a patent are not adequately defined, a zone of uncertainty is created which would discourage invention. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 116 S.Ct. 1384, 1396, 134 L.Ed.2d 577 (1996). If it is shown by clear and convincing evidence that claims are indefinite, they may be held invalid as a matter of law. *Morton International, Inc. v. Cardinal Chem. Co.*, 5 F.3d 1464, 1470 (Fed.Cir.1993). *Whether a claim is invalid for indefiniteness requires a determination of whether those skilled in the art would understand what is claimed when the claim is read in light of the specification. Id.; Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1576 (Fed.Cir.1986). Claims must "reasonably apprise those skilled in the art" as to their scope and be "as precise as the subject matter permits." *Shatterproof Glass Corp. v. Libbey–Owens Ford Co.*, 758 F.2d 613, 624 (Fed.Cir.1985).

*Semmler v. American Honda Co., Inc.*, 990 F.Supp. 967, 974 (S.D.Ohio 1997) (holding terms "whenever the engine is over-running" and "considerable fuel saving" indefinite as a matter of law) (emphasis added), *aff'd on other grounds*, —— F.3d ——, 1998 WL 791718 (Fed.Cir.1998) (table).

I agree with the contentions of Brine and Warrior that one of ordinary skill in

the art, reviewing the preamble to the '947 patent *in light of the specification,* would have little if any idea (and certainly no *singular* concept or idea) as to boundaries or scope of the claim limitation providing for "improved handling and playing characteristics." There are four points in the specification of the '947 patent that relate the preamble to the open sidewall design:

1. [T]his invention provides a new lightweight lacrosse stick having a double-wall, synthetic head having an opening or openings in the sidewalls to provide lightness *and easy handling* while retaining the strength and durability of the prior art lacrosse sticks having closed, or substantially closed, or solid sidewalls;

2. Still another object of this invention is to provide a new lightweight lacrosse stick having a double-wall, synthetic head having an opening or openings in the sidewalls *which provides improved handling and playing characteristics;*

3. The opening or openings in the sidewalls, *while providing unique advantages* in the handling of the lacrosse stick, do not in any way detract from the playability characteristics of the lacrosse stick; and

4. It has been found that an opening in excess of about 7% of the sidewall will provide a lighter weight, *easier handling* lacrosse stick.

(emphases added). None of the italicized provisions cited above teaches one skilled in the art how to avoid the trap of infringement in respect to a claim limitation providing an "improved" invention. *See Ex Parte Kristensen,* 10 U.S.P.Q.2d 1701, 1703, 1989 WL 281889 (Bd.Pat.App. & Int'f 1989); *Ex Parte Anderson,* 21 U.S.P.Q.2d 1241, 1251, 1991 WL 326600 (Bd.Pat.App. & Int'f 1991). What is claimed—*easier* than what (and by how much); *improved* by how much; *unique* compared to what— remains a mystery. Manifestly, one of ordinary skill in the art undertaking to discern the scope of the invention of the '947 patent by examining the specifica-

tion would find himself imprisoned in a "zone of uncertainty."

As Brine complains with considerable justification, "[t]his alleged limitation is subjective on so many levels it is impossible to determine the scope of [the] term" "improved handling and playing characteristics." Two co-inventors gave dramatically disparate definitions of the term when they were questioned on deposition. Moreover, the inventors seem to concede that a third person—an experienced lacrosse player—would have to *play* with an embodiment of the invention of the '947 patent in order to determine whether the "improved handling and playing characteristics" limitation was or was not embodied in an allegedly infringing product. This is not acceptable. *Ex Parte Brummer,* 12 U.S.P.Q.2d 1653, 1989 WL 274386 (Bd.Pat.App. & Int'f 1989). The notion that one reasonably skilled in the art would have to infringe the patent claim in order to discern *the boundaries of the claim* is repugnant to long-standing principles of patent jurisprudence.

To avoid the indefiniteness defense, STX urges the court to *construe* the preamble's conclusory language as adding the following limitations to claim 1: "(1) allows more efficient, easy stick movements than conventional solid sidewall heads without sacrificing the strength and durability of solid sidewall heads; (2) manifests improved aerodynamic properties; (3) has greater flexibility and recovery properties; (4) increases velocity in throwing and shooting; and (5) improves ball control." This I decline to do, however, because not one of these features is a part of the *structure* of the invention, as STX readily concedes. *See* STX's Mem. in Opp. (102(b)) at 3 ("The 'improved playing and handling' language of claim 1 is a critical *functional limitation* [of the '947 patent].") (emphasis added). Rather, at least as to "constructions" (1), (4) and (5) they plainly constitute *descriptions of what the invention does and what it allows human agents*

*employing the invention to do,* and none of them explicate the scope of the claim.

To adopt STX's expansive construction of the preamble and then to include it as a limitation on the claim would improperly expand the scope of the claim by including advantages of the invention that the inventors elected not to disclose in the claims or specification. Even if this were permissible for purposes of claim construction, it is not permissible for purposes of the instant analysis under § 112, ¶ 2. Consistent with the Federal Circuit's teachings on indefiniteness analysis under 35 U.S.C. § 112, ¶ 2, I have carefully reviewed the patent record, placing particular emphasis on the claim language and specification. I find that there simply is too little information in the specification that relates the characteristics of the preamble in any meaningful way to the open sidewall structure of a lacrosse head. If STX wanted the preamble to be regarded as a limitation, STX should have defined those terms in the specification or in the body of the claim. Although it is now expedient that STX contend that the preamble gives "meaning and vitality" to the claim, the words cannot be "construed" to lend *definiteness* to the claim that the inventors elected to abjure in the specification.

Ironically, the Examiner foreshadowed the difficulty presented here. When he originally rejected the continued application for the '947 patent, even after the preamble had been amended, he pointed out that "new issues" had been raised. Ultimately, he was willing to accept the applicants' arguments that when an invention's "advantages" are disclosed "generically," support in the form of legal argument founded upon declarations submitted in the course of prosecution history is suf-ficient to overcome an obviousness objection. The Examiner's action in permitting the inventors to overcome his obviousness objection does not help STX in the present context.

Thus, I am persuaded as a matter of law that the preamble to claim 1 of the '947 patent would render the claim fatally indefinite if, contrary to my actual view, the preamble were properly understood as a limitation in the claim. Accordingly, I shall conditionally grant Brine's motion for summary judgment on the ground of invalidity.

VI.

A. Undisputed Material Facts

Warrior contends that the '947 patent is invalid under the "on sale" bar of 35 U.S.C. § 102(b). There is no dispute as to the material facts underlying this contention.

Serious development work on the invention of the '947 patent began at least as early as January 1984 when the inventors at STX met with molders to discuss their open sidewall concept. In a June 1984 sales brochure, STX referred to an alleged "rumor" that it had gone "a step further with what promises to be *an exciting new stick* for next season," and exhorting the faithful to "[l]ook for *it* towards the end of summer at your favorite sporting goods store." (emphases added).[3]

By September 11, 1994, STX's only full-time salesperson, Robert "Bob" Griebe, had met with his STX superiors to discuss, *inter alia,* pricing of the Excalibur. By September 18, 1984, the inventors at STX had received the "first squeezes" of the Excalibur head and Jackie Davis (one of the inventors) had strung several of those

---

3. STX seems to argue that it is entitled to the benefit of an inference that the alleged "rumor" was merely that, and further, that "the exciting new stick" which is the subject of this perfectly legitimate marketing come-on could have been a reference to just about any new product it might (but did not) choose to market later in the fall of 1984. I reject this view. Although a nonmovant is entitled to all favorable inferences from facts in the context of summary judgment, those inference must be *rational,* not fanciful. In any event, even if STX is accorded the benefit of the inferences it seeks, my legal conclusion—that the invention of the '947 was on sale before the critical date—would not change.

heads. On or about September 21, 1984, STX *received* 4,000 printed catalogs containing a full-page layout relating to, and including a *photograph* of, the Excalibur head.

In this context, the record shows that on September 18, 1984 (one year and two days before the application date of the '947 patent—September 20, 1985), STX's salesman, Griebe, wrote a purchase order for 112 Excalibur lacrosse sticks, memorializing a sale to Bart's Sporting Goods ("Bart's") located in Glen Burnie, outside Baltimore. There is no dispute that on September 17 and 18, 1984, Griebe was "on the road" making sales calls to retailers such as Bart's; his expense reimbursement documents covering that period are in the record. The sticks ordered on September 18, 1984 were delivered later in the fall.

As set forth above, on the very day the Excaliburs were sold to Bart's, STX received the "first squeezes" of the Excaliburs—the preferred embodiment of the invention—from the manufacturing plant. These "first squeezes" were used in STX's marketing efforts several days later at a national trade show in Chicago. There is no dispute in the record that the "first squeezes" (as well as the Excalibur sticks sold to Bart's) embodied each element of claim 1 of the '947 patent as construed in this opinion.

STX opposes Warrior's motion for summary judgment on the ground that the Bart's order for Excalibur sticks was merely a "request for a hoped-for, future product." STX asserts that the facts demonstrate that it was uncertain whether and when the Excalibur product would be available for sale, and that therefore, there was no sale as contemplated by § 102(b). Although STX lacks any evidentiary support for an attack on the facts set forth above, it argues strenuously for a recharacterization of those facts so that they point away from the legal conclusion that the on sale bar is fully applicable to this case as a matter of law.

## B. Legal Standard

A patent is presumed valid and one challenging its validity bears the burden of proving invalidity by clear and convincing evidence. 35 U.S.C. § 282; *Mas–Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1216 (Fed.Cir.1998); *Baxter International, Inc. v. Cobe Labs., Inc.*, 88 F.3d 1054, 1057 (Fed.Cir.1996). An inventor is not entitled to a patent (and of course an issued patent is invalid) if "the invention was . . . on sale in this country, more than one year prior to the date of the application for patent in the United States. . . ." 35 U.S.C. § 102(b). The sale of the invention (which the case law makes clear includes *an offer for sale* ), must be for commercial gain and not merely for experimental use. The ultimate determination of whether an invention was on sale within the meaning of § 102(b) is a question of law. *Weatherchem Corp. v. J.L. Clark, Inc.*, 163 F.3d 1326, 1332 (Fed.Cir.1998).

In *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 151–52, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989), the Supreme Court explained that the "federal patent system . . . embodies a carefully crafted bargain for encouraging the creation and disclosure of new, useful, and nonobvious advances in technology and design in return for the exclusive right to practice the invention for a period of years." "In consideration of its disclosure and the consequent benefit to the community, the patent is granted," and the inventor receives an exclusive monopoly for a limited period of time. *Id.* at 152, 109 S.Ct. 971. "[Section] 102 of the Patent Act serves as a limiting provision . . . confining the duration of the monopoly to the statutory term." *Pfaff v. Wells Electronics, Inc.*, — U.S. —, —, 119 S.Ct. 304, 307, 142 L.Ed.2d 261 (1998). "[R]eluctance to allow an inventor to remove existing knowledge from public use undergirds the on-sale bar." *Id.*

In *Pfaff* the Supreme Court explicated the standards for application of the on sale

bar. Wayne K. Pfaff designed computer chip sockets. In 1980, Texas Instruments contacted Pfaff and asked him to design a special computer chip socket for the company. Pfaff prepared detailed engineering drawings that described the design, the dimensions and the materials to be used in the making of the socket. *Id.* Before the critical date, Pfaff showed a sketch of his concept to Texas Instruments. Subsequently, but prior to the critical date, Texas Instruments forwarded a written order to Pfaff for the purchase of 30,100 sockets. Although the invention was not reduced to practice and the order was not filled until after the critical date, the Supreme Court concluded that "the invention had been on sale for more than one year in this country before [Pfaff] filed his patent application." *Id.* at 312.

In reaching its decision, the Supreme Court held that two conditions were required before the on sale bar applied. *Id.* "First, the product must be the subject of a commercial offer for sale.... Second, the invention must be ready for patenting." *Id.* at 311–12. The Court further held that to demonstrate that an invention is ready for patenting, a party could prove either that the invention was reduced to practice before the critical date or, "that prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." *Id.* The fact that Pfaff's drawings allowed the manufacturer to produce the socket, and the sockets manufactured contained all the elements of the invention, was sufficient to establish that the invention was ready for patenting. *Id.* at 312.

The Federal Circuit applied *Pfaff* in *Weatherchem,* 163 F.3d at 1332–34. The Weatherchem Corporation was the assignee of the '399 patent, which claimed an invention for a two-flap, shake-and-spoon plastic cap. *Id.* at 1328. Weatherchem and Durkee Foods ("Durkee") had entered into a cap design project in late 1984. *Id.*

at 1330. They exchanged designs for several weeks into early 1985. *Id.* By February 8, 1985, Weatherchem had produced a drawing of a cap design. According to one of the co-inventors, a Weatherchem employee, "[all] the features of the patent claims [were] ... found in [the 2–8–85 drawing]." *Id.* (second alteration in original). On February 19, 1985, July 17, 1985 and September 3, 1985, Durkee issued three purchase orders, for 500, 990 and 275,000 caps, respectively, and Weatherchem accepted each of those orders. *Id.* at 1331.

In the meantime, Durkee notified Weatherchem on August 15, 1985 of a problem with the caps, having apparently conducted tests on the first of the 1490 caps ordered in February and July. *See id.* On August 23, 1985, Weatherchem outlined to Durkee its plans to "modify its molds." *Id.* Weatherchem and Durkee exchanged information concerning further specific changes in mold design in mid-October. *Id.* Thereafter, the problems (" 'kinks' in the cap mold") were not resolved and mass production of the invention (including the September 3, 1985 order for 275,000 caps) did not occur until January 1986. Significantly, however, the critical date was October 17, 1985. *Id.*

Weatherchem initiated an infringement action against J.L. Clark, Inc. ("Clark") and Clark counterclaimed asserting that the '399 patent was invalid and not infringed. After a bench trial, the district court held the disputed claims of the '399 patent invalid because the invention was on sale prior to the critical date, i.e., "at the very latest, in late September 1985." *Id.*

The Federal Circuit affirmed. The court first concluded that there was sufficient support in the record for the district court's finding that Weatherchem was the beneficiary of at least three commercial transactions with Durkee before the critical date for the '399 patent. *Id.* at 1333. The court specifically noted that

Durkee ordered 500 caps on February 19, 1985, for which Weatherchem noted

a $300 charge; 990 caps on July 17, 1985; and 275,000 caps on September 3, 1985, based on a price quoted by Weatherchem of $156.04 per thousand. The last of these transactions constituted at least an offer for sale, if not an outright commercial sale transaction, which Durkee accepted. *It is immaterial that the record shows no delivery of the later patented caps and no exchange of money until after the critical date.* Record evidence of a signed purchase agreement before the critical date establishes an offer for sale sufficient to invoke the on-sale bar. *See Pfaff,* —— U.S. at ——, 119 S.Ct. at 306.

*Id.* (emphasis added).

The court next inquired whether the record showed that the invention was ready for patenting. It concluded that it did. *Id.* at 1333–34. The court specifically noted that (1) Weatherchem had drawings of the invention in February and that all of the claims of the patent were found in the drawings; (2) at the time of the last of the commercial transactions, the only work that needed to be done on the invention was "fine tuning;" (3) "Durkee ordered a commercial quantity of the invention (275,000 caps) before the critical date thus showing its confidence that the invention was complete and operative;" and (4) "the manufacturer was able to produce the invention using the drawings and specifications." *Id.*

To avoid imposition of the on sale bar, Weatherchem had argued that its relationship with Durkee was a "development project." *Id.* The court held, however, that Weatherchem had failed to show experimental use of the caps and affirmed the judgment finding that the patented invention was on sale before the critical date. *Id.*

Of course, *Weatherchem* is based on a trial court's findings of fact after a contested evidentiary hearing. Nevertheless, summary judgment is appropriate in patent cases as in all others if the nonmovant is unable to demonstrate that material fac-tual disputes underlying the ultimate legal issues must be resolved. *Becton Dickinson & Co.,* 922 F.2d at 795–96.

### C. Analysis

 Application of the *Pfaff* test to the facts of this case requires Warrior to establish the absence of a dispute of material fact in respect to the two elements of the on sale defense, namely, (1) that there was a definite commercial sale or offer for sale of the invention claimed in the '947 patent more than one year before the inventors filed their patent application; and (2) that at the time of that sale or offer for sale, the invention was ready for patenting. Warrior has met its burden to show the absence of a dispute of material fact and STX has failed to meet that showing with a showing of its own that fact finding is necessary to the resolution of the on sale issue in this case.

#### a. *There Was A Commercial Offer of Sale More Than One Year Before the Application*

The initial application for the '947 patent was filed on September 20, 1985. Accordingly, the critical date for the purpose of applying the on sale bar is September 20, 1984. Any sale or offer for sale of the subject matter recited in the '947 patent prior to September 20, 1984, renders the claims invalid. The undisputed facts clearly establish that STX made an offer to Bart's for a commercial sale of the invention of the '947 patent before the critical date and that that offer was accepted and memorialized in the purchase order contained in the record. The sale was consummated later in the fall.

The undisputed facts show that STX and Bart's had a longstanding relationship and that the September 18, 1984, transaction constituting a sale of the Excaliburs to Bart's was of a piece with their ordinary course of dealing. Bart's would often purchase new lacrosse products from STX (and from Brine, as well) without first

*seeing* the product. Bart's standard practice was to place its entire order for equipment in early fall so that it would be prepared for the upcoming lacrosse season, which generally commenced on or about March 1. The order usually requested, *inter alia*, partial shipment in mid-December, with the remainder to follow by February 15. If STX was going to introduce a new lacrosse product, STX's sales representatives would contact Bart's, either by phone or in person, describe the new lacrosse products, and offer to sell the new product. Bart's usually purchased some of STX's new products so that Bart's would have a full line of STX lacrosse products. There is no proper Rule 56 material in the record to refute this scenario as an accurate and indisputable depiction of what happened in September 1984.

STX argues vigorously that Bart's September 18, 1984, order for 112 Excalibur lacrosse sticks was not an actual sale of a product. Rather, according to STX, it was a merely "a hope[ ]." STX says that it is "common practice" in the lacrosse industry to place early orders in the fall in anticipation of the Christmas selling season and the orders placed for new products "still under development" are expressly conditioned on the manufacturer's ability to deliver playable equipment.

STX argues that it had nothing to sell to Bart's because it was uncertain as to whether and when the Excalibur would be available due to the fact that any manufactured '947 lacrosse heads would have to first be tested for durability, and to see if they indeed exhibited "improved playing and handling." STX also characterizes the offer to Bart's as "conditional," suggesting that it was simply assuring itself of some "shelf space" in Bart's for the upcoming season by virtue of the September 18, 1984, transaction. Such practices, it contends, do not satisfy the on sale bar. STX also contends that there could not have been a sale to Bart's on September 18, 1984, because Bart's was never *shown* a product prior to or during the sale.

Neither singly nor in the aggregate do these contentions overcome the simple fact that there was an offer (and acceptance) of a commercial sale of the invention of the '947 patent before the critical date. While it may be true that the responsible official at Bart's never *saw* a product before the critical date, this fact is immaterial. "The key question ... is whether ... the inventor placed his invention on sale, objectively manifested by a sale or offer for sale of a product that embodies the invention claimed in the patent." *Glaverbel Societe Anonyme v. Northlake Marketing & Supply, Inc.*, 45 F.3d 1550, 1558 (Fed.Cir.1995).[4] *See also id.* ("We emphasize that this is an objective test.... [T]he measure of the bar is what was offered, not the patentees's intent."). A sale on the faith and strength of STX's reputation is no less a sale, and in any event, what is established here as a matter of law is that there was "*an offer for sale*," and *Pfaff* requires no more than that.

Moreover, the argument that the offer was "conditional" because the Excalibur, as the preferred embodiment of the invention of the '947, patent had to be "tested" before the invention could be the *res* of an

---

4. *See* M. Cicero and L. Reich, *Times Up! Inaction Causes Loss of Patent Rights*, 10 S.C.Law. 32, 35 (Jan./Feb.1999):

Precisely what must be offered for sale for barring purposes? The first part of the Pfaff test recites the word "product," *Pfaff*, —— U.S. ——, ——, 119 S.Ct. 304, 311, 142 L.Ed.2d 261, but that term deviates from § 102(b), which uses "invention." In the writers' view, the Supreme Court intended to use the latter term, not only because it is statutory and is used in the second part of the *Pfaff* test, but also because the word "product," implying a physical embodiment, contrasts with the Court's explicit observation: "the word 'invention' unquestionably refers to the inventor's conception rather than to a physical embodiment of that idea." *Id.* at 308(emphasis added). Thus, despite the Court's use of the word "product," the object of an offer for sale need not be a physical item to trigger the "on sale" bar: it need only be an "invention" that is "ready for patenting."

offer for sale falters because (1) there is no evidence sufficient to generate a dispute of material fact whether the Excalibur was by September 18, 1984, an *experimental* product (it plainly was not), and (2) "testing" in the sense that "playability and handling" constitutes a limitation on the claim is immaterial for the reasons stated above.

Thus, as a matter of law, the transaction with Bart's effected by Greibe on September 18, 1984, viewed objectively, *Glaverbel Societe Anonyme*, 45 F.3d at 1558, constituted, at the least, an offer for sale of the invention of the '947 patent. The documentary evidence in the record makes this fact indisputable, and the subsequent history of the transaction exposes it for exactly what it was. None of STX's recharacterizations undermine the correctness of this legal conclusion. The first prong of the on sale test is therefore satisfied.

b. *The Invention of the '947 Patent Was Ready for Patenting on September 18, 1994*

As a matter of law, the Excalibur is the commercial embodiment of the '947 patent.[5] In response to Warrior's request for admissions, STX admitted that the " 'Excalibur' incorporates the invention claimed in the '947 patent and is a commercial embodiment of the '947 patent." A similar response was elicited in answer to an interrogatory. STX identified the Excalibur as one of its lacrosse heads manufactured and/or sold in accordance with the '947 patent. Moreover, one of the inventors named in the '947 patent testified on deposition that the Excalibur heads STX received from the manufacturer on the date of the sale to Bart's, September 18, 1984, had "most" of the elements of the '947 patent, without ever explicating what was lacking. He testified that unspecified structural changes were made to the *mold* to make the head playable. Thus, the evidence of record establishes as a matter of law that STX's manufacturer delivered Excalibur lacrosse heads to STX on the very day of the sale to Bart's and that nothing new whatsoever was developed and incorporated into the invention after

---

5. STX seeks to analogize its circumstances to those of the inventor in *Seal–Flex, Inc. v. Athletic Track and Court Constr.*, 98 F.3d 1318 (Fed.Cir.1996), in contending that disputes of material fact preclude summary judgment.

The invention in *Seal–Flex* was an outdoor, all-weather running track which had been installed at a high school in Beloit, Kansas. *Id.* at 1320. Maxfield, the inventor, began installation of the track in the fall of 1980. However, the installation was suspended when the composition being used began to flake and chalk from the effects of the weather. The installation work resumed the following spring and was eventually completed in May 1981. The high school received an extended warranty because Maxfield was not certain that the track would hold up under conditions of use and extreme weather conditions. *Id.* In May and July 1981, representatives from two other schools were shown the Beloit track by a salesman and at least one of the schools was offered a choice of purchasing the installation one of three tracks including one "like Beloit."

Throughout the summer of 1981 and into the spring of 1982, Maxfield visited the track on a regular basis to determine whether it was enduring weather cycles and the use to which it was put by the high school athletes. *Id.* On August 23, 1982, Maxfield filed his patent application after he was satisfied that the track could withstand the conditions.

The issue in *Seal–Flex* was whether the fact that in May and July 1981 two other schools were shown the Beloit track constituted an offer for sale at a time when the invention was "complete." *Id.* at 1321. The district court found that there was a commercial sale of the patented invention and held that the on sale bar had accrued. *Id.* On appeal, however, the Court of Appeals vacated the district court's grant of summary judgment, applying the now discarded "totality of the circumstances" test. Discerning the extent to which the *Seal–Flex* reasoning survives *Pfaff* is problematic, at best. In any event, the demonstrable dispute of fact in that case as to whether the invention was "ready for patenting" plainly distinguishes *Seal–Flex* from this case, in which there is absent a dispute of material fact on that issue.

the first manufacture.[6]

STX argues that there could not have been a sale of *the invention* because it did not know by September 18, 1984, whether the Excalibur head would have the "improved playing and handling" characteristics and the strength and durability required by the limitations in claim 1. STX contends that it was not until the first Excalibur heads were tested that it was able to determine whether these claim limitations held true. STX contends that the first batch of Excalibur lacrosse heads that were delivered to it on September 18 did not pass durability testing and failed to exhibit "improved playing and handling." Consequently, according to STX, it had to arrange *adjustments to the manufacturing molds*. These contentions are unavailing, not least of all because, as explained above, the preamble to claim 1 is not a limitation on that claim. In any event, neither the adjustments to the *molds* nor the "fine tuning" to the Excalibur heads themselves, to the extent that STX has supported any claim of "fine tuning," generates a dispute of material fact as to whether the invention of the '947 patent was "ready for patenting" on September 18, 1984. *See Weatherchem*, 163 F.3d at 1332–34 (continued work on "kinks" in the mold used to manufacture the embodiment of the invention does not undermine conclusion that invention was ready for patenting.).

STX argues that at the time Bart's placed the order for 112 Excalibur lacrosse sticks, the invention was still "under development" and, therefore, the on sale bar was not triggered. Essentially, STX argues that an evaluation period was needed to determine whether the invention worked for its intended purpose. STX contends that at the time of the transaction with Bart's the invention had not been reduced to practice because STX had not yet determined whether the first molded Excalibur lacrosse heads would actually provide "improved playing and handling" while retaining the strength and durability exhibited in solid sidewall heads. STX directs the court's attention to the deposition testimony of one of the inventors, Richard Tucker, regarding the "first squeezes" that were manufactured and delivered to STX on September 18, 1984:

Q: And do you know what was done with these samples?

A: Yeah, they were, they were—we threw with them, and we, we flexed them, and we banged them, and we put them in a deep freeze and we froze them, and we put them in an oven and we heated them, and we did all types of testing.

Q: And they passed all the tests?

A: No—I'm not sure of that because I think we ran into a problem with 901 in the flow of it and everything else in the mold, and I just—*I can't say definitely, but I think that we went back and had to do some work with it.*

\* \* \* \* \* \*

Q: Do you know if they were sold?

A: No, they were not sold?

Q: How do you know that?

A: Because I think these were—we beat the dickens out of the samples that we received, and *also they needed mold modifications and*

---

6. *See Weatherchem*, 163 F.3d at 1334("Two other important record facts show that the invention was ready for patenting. [The vendee] ordered a commercial quantity of the invention ... before the critical date thus showing its confidence that the invention was complete and operative. Moreover, as in *Pfaff*, '[t]he fact that the manufacturer was able to produce [the invention] ... using [the] ... detailed drawings and specifications demonstrates this fact.' *Id.* at ——, —— U.S. at ——, 119 S.Ct. at 312."). Similarly here, Bart's ordered a "commercial quantity of the invention" when it ordered 112 Excaliburs for delivery in the ordinary course. Moreover, as explicated in text, STX was able to produce the Excaliburs contemporaneously with the commercial sale of the invention. Thus, the facts of this case leave no room for dispute.

*went back to the mold.* And when you first—

Q: Just—I beg to interrupt you. How do you know that? How do you know that they were not sold?

A: Because I recall when were, I've just—I just recall that when—*we had a lot of trouble with the startup of the Excalibur mold, and when you put a mold together, and this was—*

\* \* \* \* \* \*

A: Let me just finish what I'm saying. The point is that when we made the Excalibur *mold,* when the Excalibur *mold* was made and it was first, you know, run through what they call quick run, the—lots of times the four parts have to sit together and you get, in addition to the flows and imperfections of the product, *you have to regauge it.* As I mentioned earlier, you have a question of the material flowing together and also the things are out of, out of whack from the point of view of *where the mold goes together.* And there's *instead of a smooth surface, you might have a break in the surface where one mold doesn't seat right with the other and you have bleeding, and all this has to be—does back to the molder and things are changed.* So that's what, that's what I recall would have happened. Tucker Depos., pp. 281, 293–94. (emphases added). *And see* STX's Mem. in Opp. (§ 102(b)) at 2 ("As of September 18, 1984, STX's evaluation of the open sidewall invention while in actual use [sic] had not yet begun." [sic] ). This vague miscellany of

post-critical-date activity does not generate a genuine dispute of material fact on the issue of whether the invention of the '947 patent was ready for patenting. The rational inferences actually cut the other way.

■ In any event, STX's arguments are unavailing, as the on sale defense does not turn on whether the invention has been "reduced to practice." *Pfaff,* —— U.S. at ——, 119 S.Ct. at 311. STX has produced no evidence demonstrating, or even suggesting, that the Excalibur product was regarded as experimental. To the contrary, the evidence of record indicates as a matter of law that the invention was complete and ready for patenting at the time of the sale to Bart's. It is most clear from the fact that the manufacturer delivered Excalibur lacrosse heads to STX on the day of the sale to Bart's and that the invention underwent no further development work thereafter. Manifestly, only minor adjustments *to the mold* used by the manufacturer to produce the Excalibur head were required.[7]

In sum, Warrior has established the absence of a dispute of material fact as to whether STX had "drawings and descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention" as of September 18, 1984. This is established by virtue of the delivery to STX on that date of the preferred embodiment of the invention claimed in the '947 patent. Neither the "fine tuning" of the preferred embodiment nor the tweaking of the molds after the commercial offer for sale of the invention, *see Weatherchem,* 163 F.3d at 1331, is

7. It appears that the scant evidence in the record bearing on the issue of whether and to what extent additional development work on the invention occurred after September 18, 1984, is by a purposeful design of STX. For example, when Griebe was examined on these and related questions, counsel made speaking objections (in violation of the discovery guidelines approved by this court), including (inexplicably) the objection that there was a "lack of foundation" for certain questions, and insisting that Griebe's answer to a different question be read back before he was required to respond to the straightforward inquiry, which had not been previously put to him, "can you name one specific developmental change that was made from September 18th until November of 1984?" *See* Griebe Dep. at 282–85.

material to the on sale analysis under the circumstances of this case. *Cf. id.* at 1334.

Accordingly, for the reasons stated herein, I conclude as a matter of law that the invention of the '947 patent was on sale in this country within the meaning of 35 U.S.C. § 102(b) more than one year before the application was filed. Accordingly, a declaratory judgment of invalidity shall be entered.[8]

## VII. BRINE PATENT '434 IS NOT INFRINGED BY STX'S RAPTOR STICK

The sole remaining issue under the Brine/SLI counterclaim is whether STX's Raptor stick infringes the '434 patent.

"A patent infringement analysis involves two steps. First, the court determines the scope and meaning of the asserted claims. *See Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 372–74, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996)[,] . . . [which poses] a question of law. . . . Second, the properly construed claims are compared to the allegedly infringing device." *Mas–Hamilton Group,* 156 F.3d at 1213. It is clear that, as properly construed, the claims of the '434 patent are not infringed by the Raptor stick.

### A. Background of the '434 Patent

The patent heading of the '434 patent reads "Lacrosse Stick Head With Bulged Side Walls." The intended objective of the design of the lacrosse head is to provide a pocket space for the ball, spaced from the throat portion of the head and nearer the lip portion. Claims 1 and 9 of the '434 patent are independent claims. Claims 2, 3, and 8 are dependent claims. The claims recite:

1. A lacrosse stick head comprising a frame and netting attached to said frame, said frame comprising side wall means extending from a throat portion of said frame, said side wall means having a bottom edge thereof extending outwardly such as generally to define a bulge in the bottom of said side wall means generally about midway of the length of said side wall means, said side wall means having holes therein proximate said bottom edge, said netting being attached to said wall means by portions of said netting disposed in said side wall means holes, said netting defining a ball pocket disposed generally alongside and beneath said bulge and generally midway sidewise of said netting, whereby to provide a lacrosse stick head having a ball pocket spaced from said throat portion of said frame and said side wall· means.

2. The lacrosse stick head in accordance with claim I wherein said side wall means is joined to a lip portion of said frame, said lip portion being provided with holes therein, and said netting being further attached to said frame by other portions of said netting disposed in said lip portion holes, said ball pocket being spaced from said lip portion.

3. The lacrosse stick head in accordance with claim 2 wherein said side wall means comprise first and second side walls, each joined at one end to said throat portion and at another end to said lip portion of said head.

8. The lacrosse stick head in accordance with claim 1 in which said bulge comprises an outward extension of said bottom edge substantially in the plane of said side wall means.

---

8. STX argues forcefully that a firm of STX's experience and sophistication could hardly have fallen into the on sale trap. I agree that the question naturally arises: how could such a monstrous error occur? One answer may lie in the fact that the September 18, 1984, sale to Bart's was in the form of a handwritten purchase order completed by Greibe, but

the STX "shipping order" contained an "order date" of "9/25/84." The latter document contained the initials "B.G." (presumably "Bob Greibe") in the block for "purchase order number." In the final analysis, of course, there is never a satisfactory answer to the question. *Cf. Pfaff; Weatherchem.*

9. A lacrosse stick head comprising a frame and netting attached to said frame, said frame comprising first and second side walls extending divergently from a throat portion of said frame and joining a lip portion, each of said side walls having a bottom edge thereof extending outwardly such as generally to define a bulge in the bottom of the side wall, said bulge being disposed generally about midway of the length of the side wall, said netting being attached to said side walls at locations proximate said bottom edges of said side walls, said netting defining a ball pocket disposed generally alongside and beneath said bulges, generally midway sidewise of said netting, and forwardly of said throat portion.

STX argues that Brine/SLI has failed to produce any substantial evidence to support its infringement claim against STX's Raptor lacrosse head. STX asserts that while it has presented evidence of noninfringement, Brine/SLI has failed to present any comparative evidence between the patented invention and STX's Raptor head demonstrating infringement. Nor has Brine/SLI presented expert testimony to prove literal infringement or infringement under the doctrine of equivalents.

Brine/SLI answers that STX has failed to establish an absence of genuine issues of material fact concerning Brine/SLI's claims of infringement. In support of its argument, Brine/SLI charges that STX has improperly construed the claims of the '434 patent. Consequently, according to Brine/SLI, STX's infringement analysis is flawed.

## B. Infringement Elements

■■■ Title 35 U.S.C. § 271(a) provides in part:

[W]hoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent.

35 U.S.C. § 271. A patent claim is literally infringed only if "the accused device contains every limitation in the asserted claims." *Mas–Hamilton Group*, 156 F.3d at 1211. Failure of proof as to any one element results in a finding of non-infringement. *Athletic Alternatives, Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1582 (Fed. Cir.1996).

■■■ A product which does not fall within the literal scope of a patent claim and therefore does not literally infringe may still infringe a claim under the doctrine of equivalents if the differences between the accused product and the claimed invention are "insubstantial." *Hilton Davis Chem. Co. v. Warner–Jenkinson Co., Inc.*, 62 F.3d 1512, 1517 (Fed.Cir. 1995), *rev'd on other grounds*, 520 U.S. 17, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). The Supreme Court has explained that limiting infringement analysis to literal infringement "would place the inventor at the mercy of verbalism and would be subordinating substance to form." *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 607, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). The doctrine of equivalents protects the patent owner against infringers who make insubstantial changes to the claimed invention, so that the accused product may not literally read on the claims, but nonetheless appropriates the invention. *Id.* at 607, 70 S.Ct. 854.

■■■ In *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.Cir. 1996), the Federal Circuit established the hierarchy of sources to review in interpreting the claims of a patent. They are, in descending order of importance: (1) the claim language itself; (2) the specification of the patent; and (3) the prosecution history. The three combined are considered "intrinsic evidence." Extrinsic evidence may also be considered, but such evidence is accorded lesser weight in the evaluation. The extrinsic evidence includes: dictionaries, prior art, technical articles and expert or other testimony. *Id.* at 1582, 1584.

"For claim construction purposes, the [specification's] description may act as a sort of dictionary, which explains the invention and may define terms used in the claims." *Bell Communications,* 55 F.3d at 620; *Markman,* 52 F.3d at 979. "The key terms of a claim are to be interpreted according to their ordinary and accustomed meaning to those skilled in the art, unless it appears from the specification that the inventor used them differently." *Promega Corp. v. Novagen, Inc.,* 6 F.Supp.2d 1004, 1019 (W.D.Wis.1997) *(citing Beachcombers v. WildeWood Creative Prods., Inc.,* 31 F.3d 1154, 1158 (Fed.Cir. 1994)).

The intrinsic evidence is considered first. *Markman,* 52 F.3d at 980–81. If the intrinsic evidence does not resolve the meaning of a disputed claim or term, the court may, in its discretion, rely on extrinsic evidence. *Id.* at 980. "However, when 'an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim,' it is improper to rely on extrinsic evidence." *CVI/Beta Ventures, Inc. v. Tura LP,* 112 F.3d 1146, 1153 *(citing Vitronics,* 90 F.3d at 1582). Moreover, extrinsic evidence may not be used to "vary or contradict the claim language." *Vitronics,* 90 F.3d at 1584. Claims must be read in the context of the problems solved, and with a common sense approach to the objectives of the invention. *Minco, Inc. v. Combustion Engineering, Inc.,* 903 F.Supp. 1204,1218 (E.D.Tenn.1995), *aff'd,* 95 F.3d 1109 (Fed.Cir.1996).[9]

C. As Properly Construed, the Claims of the '434 Patent Are Not Infringed

Application of the above principles here compels the conclusion that STX is entitled to judgment as a matter of law because Brine/SLI has failed to counter the evidence presented by STX demonstrating that the Raptor lacrosse head does not infringe claims 1 and 9 of the '434 patent as herein construed. Similarly, there is no evidence in the record demonstrating that the Raptor lacrosse head infringes claims 2, 3, and 8 of the patent.

Brine/SLI has alleged that STX's Raptor lacrosse head infringes claims 1, 2, 3, 8, and 9 of the '434 patent. Of these claims, claims 1 and 9 are the only independent claims. As such, claims 1 and 9 represent the minimum number of elements required to infringe the '434 patent. Each of the claims contain the limitation that the sidewalls of the lacrosse head must "hav[e] a bottom edge thereof extending outwardly such as generally to define a bulge in the bottom" of the sidewall, "generally about midway of the length of [the] sidewall."

STX contends that the Raptor lacrosse head does not infringe the '434 patent because it does not have the characteristic "bulge" feature denoted in claims 1 and 9 of the '434 patent. At issue is the meaning of the term "bulge." Adverting to the specification, claim language, testimony of the inventors of the '434 patent and a dictionary definition, STX argues that the "bulge" limitation is properly defined as a "swelling" or "belly" protruding from the bottom sidewalls. STX argues that the specification of the patent clearly defines "bulge" as "an outward extension of the bottom edge." STX describes the accused product, the Raptor head, as having sidewalls with a continuous "curve" as opposed to a protuberance or swelling in the bottom sidewalls.

Brine/SLI asserts that there is no distinction between a "curve" and a "bulge" and that the Raptor design is the same as

9. Claims are not limited to the embodiments disclosed in the patent itself, *Ekchian v. Home Depot, Inc.,* 104 F.3d 1299, 1303 (Fed.Cir. 1997) ("While examples disclosed in the preferred embodiment may aid in the proper interpretation of a claim term, the scope of a claim is not necessarily limited by such exam-ples."), and they should be construed to sustain their validity whenever it is possible rationally to do so. *Modine Mfg. Co. v. United States Int'l Trade Comm'n,* 75 F.3d 1545, 1556 (Fed.Cir.), *cert. denied,* 518 U.S. 1005, 116 S.Ct. 2523, 135 L.Ed.2d 1048 (1996).

the '434 patent design. In support, Brine/SLI cites the definition of "bulge" given in one dictionary: an "outward curve." Instead of focusing particularly on defining the term "bulge," Brine/SLI focuses on defining words in the specification associated with demarcating the limitation of the "bulge" design:

> Nowhere in the specification or claims of the '434 patent do the inventors apply a special or unique meaning to the words "extends," as used in the specification, or "extending", as recited in claim 1 of the '434 patent, to define the word "bulge." Consequently, the word "extending" as used in claims 1 and 9 of the '434 patent has the ordinary meaning as construed by someone skilled in the art. The word "extend," as used in the '434 patent to define "bulge," obviously means, "to stretch or spread out to full length; to expand the are[a] or scope . . . ." It is also apparent from the '434 specification, that the word "bulge" does not have a special meaning contrary to its ordinary meaning, which includes . . . "protruding part; an outward curve or swelling."

I have carefully considered and evaluated the claim language and the specification. I have also reviewed the prosecution history, interrogatories, and deposition testimony cited by the parties in support of their respective positions. I conclude that the meaning of the term "bulge" is clear when read in light of the claims and specification together. "Bulge" as used in claims 1 and 9 comports with the ordinary and plain meaning of the term, as it would be understood by one of ordinary skill in the art. Furthermore, it is clear from the patent as a whole that "bulge" has an even more distinct and finite meaning as it relates to the invention. First, the "bulge" is in the bottom sidewall as described in claims 1 and 9. The "bulge" begins about midway in the bottom sidewall. Claim 5 places further limitations on the bulging feature. The height of the sidewalls at the midpoint of the bulge is 1.15 – 1.5 times

the height of the sidewall at the throat end. Clearly, the bulging feature creates a swelling near the midpoint of the lacrosse head and in the bottom sidewalls. As a matter of law, the "bulge" limitation in the '434 patent is not simply a "curve" but is a curve-like protuberance.

As described in the specification, the "bulge" design was a move away from the design where the ball pocket was in the throat area. The '434 patent design was to create a ball pocket nearer the lip portion of the head. This novel design was viewed by the inventor as facilitating the advanced playing skills of lacrosse players who play and pass the ball using wrist-flicking movements as opposed to the old method of full arm swings. The '434 patent design is intended to keep the ball from leaving the head too soon, thus enabling the player to exercise greater control in directing the ball when propelling it.

The prior art reviewed during patent prosecution supports these conclusions. In an "Information Disclosure Statement" the following references were cited:

> Brine '737 is illustrative of lacrosse stick head frames in which the upper and lower edges of the side walls are substantially parallel. . . .
>
> Brine '248 and '260 are illustrative of lacrosse sticks having typical rearwardly-disposed ball pockets. . . .
>
> Brine '666 and '260 show a lacrosse stick head frame in which the side walls are provided with greater height from the throat area than from the lip area. . . .

*See* Brine's Response, '434 Patent File Wrapper. Further, during patent prosecution, the original title of the patent was changed from "A Lacrosse Head" to "Lacrosse Stick Head With Bulged Side Walls" to reflect the distinct bulging feature. *Id.*

The intrinsic evidence alone is enough to resolve the meaning of the term "bulge." Nevertheless, the testimony of Peter Brine, Jr. and William Brine III, the inventors of the '434 patent, also supports

the court's interpretation. William Brine III defined "bulge" as

[A] [b]ulge starts on a defined plane and goes down, and comes back up to somewhere near that plane; and a curve doesn't necessarily have to do that.

He testified further that Brine used the term "bulge" "by what the dictionary said." Id. He also offered this construction:

In order to shift the ball pocket forward in the head, a lowering of the sidewall in the center is needed. This bending of the lower line of the sidewall forms a bulge that extends outwardly from the imaginary plane between the shaft and the scoop.

Peter Brine offered the following construction:

Q: What was the invention of the 434 patent?

A: This was a stick that—rather a lacrosse head that had a belly or a bulge in the sidewall, bottom of the sidewall.

Q: And what is your understanding of the term "Bulge"?

A: An outcropping. . . . [A]n outcropping off of a line.

Having closely examined the Raptor head and other evidence of record and compared its features with claims 1 and 9 of the '434 patent, I conclude that the Raptor lacrosse head does not exhibit the bulging feature of the '434 patent claim limitation. Both the top and bottom sidewalls of the Raptor enjoy the design of a smooth and continuous curve that begins at the throat and flows up through to the lip portion. The ball pocket in the Raptor design sits closer to the throat portion rather than closer to the lip portion. Importantly, there is no "bulge" exhibited in the Raptor head bottom sidewalls.

The only arguably substantial evidence presented by Brine/SLI to demonstrate infringement is the expert testimony of William Brine III that:

the lower edge of the Raptor starts as a flat line that is parallel to the handle of the lacrosse stick. At a point about 3/4″ from the throat, the lower edge of the sidewall extends down to form a bulge generally about midway along the sidewall.

Brine/SLI asserts that this expert testimony demonstrates the existence of a genuine issue of material fact. Brine also references its response to an interrogatory propounded by STX.

■■■ Brine/SLI's expert testimony does not create a dispute of material fact because the evidence presented by both parties establishes how one skilled in the art would understand and interpret the term "bulge." "[A]n expert's opinion on the ultimate legal issue must be supported by something more than a conclusory statement." *In re Buchner*, 929 F.2d 660, 661 (Fed.Cir.1991). Furthermore, Brine/SLI's response to the interrogatory is little more than a recitation of claim language from the '434 patent.

Brine/SLI has the burden of proving infringement by a preponderance of the evidence. Here, Brine/SLI has presented no evidence that the Raptor head infringes literally or under the doctrine of equivalents the claims of the '434 patent. Brine/SLI insists that no testing or measurement is needed to determine infringement and has admitted that none was done. Brine/SLI has relied entirely on its attorney's conclusory advice and an equally conclusory expert opinion that the Raptor head infringes the '434 patent. Brine/SLI has failed to present evidence showing design and/or functional similarities between the Raptor head and the claims of the '434 patent. On the other hand, STX has presented evidence establishing that the Raptor head does not infringe the '434 patent.

Based on the record before me, I conclude that STX is entitled to summary judgment because the bulge in the claims of the '434 patent is not the curve of the Raptor head.

## VIII. CONCLUSION

For the reasons stated above, I shall grant Warrior's motion for summary judgment on the ground that the invention of the '947 patent was on sale more than one year before the application date and therefore the patent is invalid. I shall also grant, conditionally, Brine's motion for summary judgment that the '947 patent is invalid on the ground of indefiniteness. I shall grant STX's motion as to noninfringement as to the '434 patent; STX is entitled to a declaratory judgment that the Raptor lacrosse head does not infringe the '434 patent. Brine's counterclaim based on the '112 patent shall be dismissed without prejudice for lack of jurisdiction. All remaining motions for summary judgment are denied.

An order and judgment follow.

### ORDER

In accordance with the foregoing Memorandum, it is this 25th day of February, 1999, by the United States District Court for the District of Maryland, ORDERED

(1) That the Motions for Summary Judgment (Paper # 119 and # 122) filed by Warrior Lacrosse, Inc. and Brine, Inc. BE, and they hereby ARE GRANTED; and it is further ORDERED

(2) That the Motion for Summary Judgment (Paper # 117) filed by STX, Inc. BE, and it hereby IS GRANTED; and it is further ORDERED

(3) That the Clerk CLOSE this case and TRANSMIT copies of this Order and the accompanying Memorandum and Judgment to the attorneys of record.

### JUDGMENT

In accordance with the foregoing Memorandum, it is this 25th day of February, 1999, by the United States District Court for the District of Maryland,

(1) ORDERED, ADJUDGED, DECLARED AND DECREED THAT CLAIM 1 OF U.S. PATENT NO. 5,566,947 IS INVALID; and it is further

(2) ORDERED, ADJUDGED, DECLARED AND DECREED THAT U.S. PATENT NO. 5,035,434 IS NOT INFRINGED BY STX'S RAPTOR PRODUCT; and it is further ORDERED

(3) That all remaining claims, counterclaims, crossclaims, and all claims by and against intervened and impleaded parties, are dismissed; and it is further ORDERED

(4) That any and all prior rulings made by this Court disposing of any claims against any parties are incorporated by reference herein and this order shall be deemed to be a final judgment within the meaning of Fed.R.Civ.P. 58.